UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| CAPITAL ONE FINANCIAL CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRIAN SYKES, JONATHAN WOOD, and )<br>TIMOTHY SMITS, )<br>)<br>Defendants. ) | NO. 3:20-cv-763 |

## COMPLAINT

Plaintiff Capital One Financial Corporation ("Capital One"), by and through counsel, hereby brings the following Complaint for a temporary restraining order, preliminary injunctive relief and other relief against Defendants Brian Sykes ("Sykes"), Jonathan Wood ("Wood"), and Timothy Smits ("Smits") and requests that the Court enter judgment against Defendants for violation of the Defend Trade Secrets Act, violation of their fiduciary duty, breach of contract, and a declaratory judgment.

1.     Defendants are former employees of Capital One who were in charge of Capital One's commercial banking office in Boston, Massachusetts.  As part of their duties as bankers, the Defendants had access to Capital One's trade secrets, confidential information, and work product. Among the trade secrets that Defendants had access to were Capital One's commercial bank customer lists.  Capital One's customer lists include information about current, former, and prospective clients with whom Capital One may do business in the future.  Its customer lists give it a competitive advantage over other financial institutions in maintaining its client relationships

and sourcing new business.  Confidential customer lists are the paradigm of legally-protected trade secrets.

2.      The Defendants left Capital One in July and August to join non-party Orix Corporation ("Orix").  Orix is a direct competitor of Capital One and would unfairly benefit if its employees had access to Capital One's customer lists.

3.      Unfortunately, when the Defendants were leaving Capital One, they violated their legal and contractual duties to Capital One by misappropriating Capital One's trade secrets, confidential information, and work product.

4.      The misappropriation included multiple failed efforts to remove customer lists from Capital One's computer system by traditional methods followed by a scheme to use Capital One's encrypted communications systems to bypass the security systems Capital One had in place to protect its confidential customer lists.

5.      These actions are eroding the competitive advantage Capital One enjoys with its confidential customer lists, as Defendants can now use those lists at a direct competitor to solicit and steal business from Capital One.

## PARTIES

6.      Capital One is a corporation organized under the laws of the state of Delaware, with its principal place of business in Virginia.

7.      Upon information and belief, Sykes is domiciled in Massachusetts.

8.      Upon information and belief, Wood is domiciled in Massachusetts.

9.      Upon information and belief, Smits is domiciled in Massachusetts.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1331.

11.    Venue is properly laid in the forum because Defendants contractually consented to the personal jurisdiction and venue of any state or federal court located within the Commonwealth of Virginia.

## FACTS

12.    Capital One is a financial holding company.  Through its subsidiaries, Capital One offers a broad spectrum of financial products and services to individual consumers, small businesses, and commercial clients.  These products include lending and deposit activities, auto loan lending and servicing, and commercial real estate lending and deposit gathering.  Capital One's business is interstate in nature.

13.    Orix is a financial services company that, according to its website, "provides the capital solutions clients need to take advantage of immediate and long-range market opportunities that can transform their business and propel them to the next level."  Orix is a direct competitor of Capital One.

14.    The Defendants worked as a commercial banking team at Capital One in Boston, Massachusetts until July and August of 2020.  The customer lists misappropriated by Defendants concern Capital One's commercial banking line of business.

15.    Customer lists are regularly recognized as trade secrets in both Virginia and Massachusetts. *Physicians Interactive v. Lathian Sys. Inc.*, 2003 WL 23018270, *8 (E.D. Va. 2003) ("Numerous courts have held that customer lists and customer information are classic examples of trade secrets."); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (granting preliminary injunction to enjoin Defendants from using or disseminating Plaintiffs' customer list information; "A trade secret may consist of any formula, pattern, device

3

or compilation of information… [including] a list of customers.") (citing *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc*., 357 Mass. 728, 736 (1970)).

16.     Sykes worked at Capital One from August 9, 2010 to August 31, 2020.  At the time he left Capital One, Sykes was a Senior Director, Originations Manager I, in the Commercial Real Estate Division.  In that role, Sykes was primarily responsible for leading a team of bankers who sought to originate agency loans.  He was responsible for developing new business for Capital One.

17.     Wood worked at Capital One from April 29, 2011 to August 31, 2020.  At the time he left Capital One, Wood was a Senior Director, Originators Manager I, in the Commercial Real Estate Division.  Wood reported to Sykes.  In his role, Wood was primarily responsible for originating agency loans.  He was responsible for developing new business for Capital One.

18.     Smits worked at Capital One from August 21, 2013 to July 8, 2020.  At the time he left Capital One, Smits was a Senior Manager, Originator I, in the Commercial Real Estate Division.  Smits reported to Sykes.  In his role, Smits was primarily responsible for originating agency loans.  He was responsible for developing new business for Capital One.

19.     In light of their access to Capital One trade secret information, when they began working at Capital One Sykes and Wood entered into Confidentiality, Work Product and Non-Solicitation of Employee Agreements with Capital One. Smits entered into a Confidentiality and Work Product Agreement with Capital One at the beginning of his employment.  The terms governing confidentiality and work product are identical in the Defendants' agreements (hereinafter, the "CWP Agreements").

20.     Pursuant to Paragraph 1 of the CWP Agreement, each Defendant agreed that:  (a) he would not, both during and after his employment with Capital One, use for his own benefit or

for the benefit of others, any of Capital One's Confidential Information; (b) he would return all documents received, possessed, used, or reviewed during the course of his employment that contained Capital One's Confidential Information; and (c) he would inform Capital One of the existence of all such information located on the memory of any computer or other electronic data storage devices or media that he used other than Capital One computers or storage devices.

21.     Under the terms of the CWP Agreement, Defendants agreed that Capital One's Confidential Information was defined to include, among other things, "customer lists."  More generally, Confidential Information was defined to include "information that derives actual or potential value from the fact that it is not generally known to members of the general public, which concerns the business or affairs of Capital One."

22.     Beyond contractually binding its employees to protect its confidential information, Capital One takes additional measures to maintain the information's secrecy:

- Capital One maintains specific policies requiring that its employees maintain the secrecy of its trade secrets and confidential information and prohibiting the disclosure of such information to persons or entities outside of Capital One. Employees are regularly made aware of, and trained on, these policies.

- Capital One's email system can recognize certain information commonly found in a customer list and automatically block attempts to send such information outside of Capital One's network.

- Capital One provides laptops to certain employees, including all of the Defendants, so they can access the Capital One network at home.  These employees have no legitimate business purpose to email any Capital One document to their personal email addresses.

- Capital One restricts employees' access to customer lists. When the Defendants logged into their computers, they were automatically restricted from seeing the full and complete Capital One customer list.

**The Defendants Prepare to Leave Capital One for Orix**

23.     Upon information and belief, Defendants began looking to leave Capital One as early as January 2020. Their preparations included collecting and reviewing documents to help them plan a transition that would maximize their compensation both at Capital One and at their new employer.

24.     On January 8, 2020, Wood copied Sykes on an email that attached biographies for Wood and Sykes. These biographies could be used to convince a new employer to hire them.

25.     On March 24, Smits conducted an electronic chat with a coworker about a complaint they had at work. In response to the coworker stating, "I'm done, let's move," Smits replied, "Yea… 100% with you."

26.     On March 26, Sykes sent to personal email a loan list encompassing more than 100 property names and maturity dates of loans originated by Sykes. This information was crucial to calculating his ongoing and future commission compensation.

27.     On March 27, Wood sent a copy of the contract that governs his commission compensation to his personal email address. This document would assist Wood in negotiating compensation from a future employer.

28.     On March 31, Sykes sent a copy of his retirement benefits to his personal email address. This information would assist Sykes in planning his departure from Capital One.

29.     On April 3, 2020, Sykes sent to his personal email address an email with the subject "Maturing Loans" that attached a list of loans that he originated along with their maturity

6

dates. The attachment contained a conspicuous warning: "Please note: The information contained in this workbook is confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One… A review, retransmission, dissemination, distribution, copying or other use of this information is strictly prohibited." Sykes ignored this disclaimer. He had no legitimate business reason to send this document to his personal email account. This information would allow him to steal future business from Capital One.

**Defendants Steal Capital One's Trade Secrets**

30. After closely tracking how to maximize their compensation on their way out of the door, the next step in the Defendants' scheme was to systematically misappropriate Capital One's trade secrets, confidential information, and work product to ensure they could maximize their compensation at their new employer. Their misappropriation of customer lists entailed emailing the lists from their Capital One email addresses to their personal email addresses, which they could continue to access after they left Capital One. Below are a few examples of Defendants' misappropriation of trade secrets and confidential information.

31. On May 6, Sykes sent an email with the subject "Bridge Contacts" to his personal email address. "Bridge" referred to bridge loans, which was a type of financing that Sykes offered clients. The loan attached more than 30 files, each with contact information for clients and prospects. This was confidential information that should not have been shared outside of Capital One's network.

32. On May 20, Wood sent to his personal email an email with a subject line of "Marketing Plan" and attached a file named "Originator Sales Marketing Plans - B. Sykes and J. Wood." The file contained a detailed customer list that constitutes a trade secret.

7

33.     On May 27, at 7:22 AM, Sykes attempted to send an email directly from his Capital One work email address to his personal email address. The subject of the email was "Backup." The email attached a customer list.

34.     Sykes then immediately received an auto-generated email from Capital One's Data Loss Prevention system ("DLP") notifying him that his email was blocked. The email stated, in part: "Email not delivered… Your email sent on 2020-05-27 at 07:22:31 with the subject "Backup" to an external recipient contained Capital One Confidential and/or Confidential Proprietary data. This email was blocked by Capital One's Data Loss Prevention Program and did not reach its intended recipient(s). **If your business process has a legitimate need to email this information outside of Capital One**, you must use Capital One's email encryption tool to restrict access to the information to the intended recipient(s)." (emphasis added)

35.     Undeterred by Capital One's security system working exactly as intended and warning Sykes that he should not send this information to his personal email address without a legitimate business need, Sykes then immediately sent multiple emails from his Capital One email address to his personal email address through Capital One's encrypted communication system. This circumvented the DLP system.

36.     Sykes sent the first encrypted email to his personal email address at 7:59AM. This email had the subject "Contact Back-up." It attached an Excel spreadsheet entitled "contacts2 (1)," which contained a lengthy list of Capital One customer information, including names, addresses, phone numbers, birthdays, email addresses, family names, who referred the customer to Capital One, business information, hobbies, billing information, priority level, and more. This file constitutes a protected trade secret.

37.     Sykes sent the second encrypted email to his personal email address at 8:10AM.

The subject of the email was "Sykes Contacts Back-up" and attached to the email was an Excel spreadsheet entitled "Sykes Contacts," which contained the same information for additional customers. This file constitutes a protected trade secret.

38.    The encrypted email system is designed for employees to be able to send Confidential Information outside of Capital One's network on an as-needed, case-by-case basis. Sending customer lists to personal email addresses without a legitimate business purpose is never permitted.

39.    By June 1, 2020, Defendants were actively negotiating with a recruiter the terms of their transition to Orix. On that date Sykes sent an email from his personal email address to a recruiter, copying Wood, but using Wood's Capital One email address. Smits is on an earlier email in the string. The email string details Wood and Sykes's comments on the terms of the proposed contracts that Orix was offering Defendants.

40.    The June 1 email confirms that Defendants' misappropriation of Capital One's customer lists and confidential information was part of their effort to transition away from Capital One and not for any legitimate business purpose. The proposed employment agreement with Orix contained a provision called "Calling Area" that would determine the geographic area where Sykes's team could develop business. Wood tells Sykes that "Calling Area is a big red flag… This is something I can see as an understanding/handshake agreement now, but could become a problem in the future especially as I'm trying to build my business. **Our client list, if we get those blessed** might give me more comfort…" (emphasis added). Here, Wood is suggesting that they get Orix to "bless" – that is, approve – the team's ability to continue calling clients that they bring with them from Capital One, notwithstanding the Calling Area provision. That would make misappropriating Capital One's customer lists a critical step in joining Orix.

41.     On June 5, 2020, Wood sent an email from his Capital One email address to his personal email address.  In an apparent attempt to hide what he was doing, Wood sent the email under the subject "Little League" and attached several files concerning baseball.  However, Wood also attached materials for his planned move to a Capital One competitor: "2020 Resume Bio," "BRAG SHEET," "JKW Clients & Prospects," and "Jon Wood Business Outline."  The "JKW Clients and Prospects" file included information about Capital One clients and prospective clients – including Capital One clients for which Wood was not performing work – such as notes regarding the statuses of the prospects, locations of contacts, and the volume of business closed with certain clients.  This constitutes a protected trade secret.

42.     On June 11, 2020, Wood sent an email from his Capital One email address to his personal email address, copying a coworker.  The email attached an Excel spreadsheet called "Originator Sales_Marketing Plans – B. Sykes J. Wood," which was an updated version of what he emailed himself on May 20.  Wood stated in the email: "Here [*sic*] updated client/prospect list with my notes for marketing plan, and client status."  The attachment contained detailed information regarding clients and prospective clients.  This document constitutes a protected trade secret.

43.     On June 22, 2020 at 11:00 AM, Smits sent an email from his Capital One email address to his personal email address with the subject "See attached."  The email attached an Excel spreadsheet called "cid_E8AD7659," which is a customer list with detailed client contact information.  This document constitutes a protected trade secret.

44.     Smits then immediately received an auto-generated email from Capital One's DLP system notifying him that his email was blocked.  The email stated, in part: "Email not delivered… Your email … with the subject "See attached" to an external recipient contained Capital One

10

Confidential and/or Confidential Proprietary data. This email was blocked by Capital One's Data Loss Prevention Program and did not reach its intended recipient(s). **If your business process has a legitimate need to email this information outside of Capital One**, you must use Capital One's email encryption tool to restrict access to the information to the intended recipient(s)." (emphasis added)

45.     Smits then arranged for the same email to be sent to his personal email address by a coworker approximately 30 minutes later, with the same subject and attachment, using Capital One's encrypted email system. The email successfully went through to this personal email address, circumventing Capital One's DLP system.

46.     Defendants did not inform Capital One that they were sending these customer lists to their personal email address.

47.     Defendants did not return the customer lists after their employment with Capital One terminated.

48.     Capital One did not authorize Defendants to send customer lists to their personal email accounts or to retain those documents after their employment with Capital One terminated.

49.     Defendants agreed under the terms of their CWP Agreements that their violation of the agreement would warrant the award of attorneys' fees and equitable relief, specifically including the imposition of an injunction.

50.     Defendants violated the terms of their contracts with Capital One and their legal obligations to Capital One by (a) sending Capital One's Confidential Information to their personal email addresses without Capital One's authorization, and (b) retaining those documents after their employment terminated.

51.     The documents misappropriated by Defendants constitute legally protectable trade

11

secrets and confidential information.

**Sykes and Wood Are Ineligible for Additional Compensation**

52.      Capital One entered into separate incentive compensation plans with Sykes and Wood with materially similar terms.  Each contract was called "Capital One Multifamily Finance Originator Incentive Plan," ("Plan").  The Plans are valid and enforceable contracts.

53.      Under the Plans, Sykes and Wood were eligible to receive certain cash incentive and equity awards for their performance as employees ("Awards").  Once earned, these Awards would be paid to Sykes and Wood if they were employed at Capital One on the date the Award was paid, or if they left the company after reaching "Retirement."  Retirement (which is a defined term in the Plan) is permitted if an employee reaches the age of 55 and has accrued at least 10 years of service at Capital One.

54.      Sykes began work at Capital One on August 9, 2010.  Because he is over the age of 55, he therefore became eligible for "Retirement" on August 9, 2020.

55.      The arrangements for the Defendants (and certain non-Defendant coworkers who also left Capital One to join Orix) to leave Capital One for Orix were finalized in June.  Smits and two coworkers gave notice of their departure with an effective date of July 8, 2020.

56.      Sykes indisputably knew why these three employees on his team were leaving Capital One: **he had been negotiating the terms of their new employment.**  Indeed, in the same June 1 email referenced above, Sykes, Wood, and Smits discussed the signing bonuses, non-compete provision, and non-solicitation provisions for "Mike and Mitchell," the two coworkers who left with Smits.

57.      When Smits and the other two coworkers left, Sykes called his manager at Capital One and feigned outrage that they would leave his team and assured her that he had been blindsided

12

by this development.

58.     Given the steps Sykes was taking simultaneous to this statement, Sykes plainly was attempting to mislead his manager and obfuscate the steps being taken to leave Capital One with trade secrets and other Confidential Work Product.  Moreover, Sykes knew he needed to remain at Capital One until August so that he could "Retire" and collect his full Award payment. If Capital One found out that Sykes was arranging for his entire team to leave Capital One (and that they had been stealing trade secrets in the process), Capital One would have terminated Sykes immediately.  That would have prevented him from "Retiring."

59.     Because Capital One had been kept in the dark about their scheme, Sykes and Wood were able to stay at Capital One and leave on their own terms.  Their last official date of employment was August 31, 2020.

60.     Eligibility for Awards under the Plan is contingent upon good behavior.  Under Section VI(E) "No Violation of Law, Ethics, or Policy," "A Participant cannot earn an Award if the Participant engages in any violation of any federal, state, or local law or Capital One policy, procedure, or Code of Business Conduct and Ethics that pertain to his/her work duties…"

61.     The determination of whether any activities "do not comply with the letter and spirit of applicable laws and regulations" is in "Capital One's sole discretion."  Section VII.

62.     Shortly after they left, Capital One began an investigation to determine whether Sykes and Wood had complied with the terms of the Plan and whether they were eligible for any Award payments.

63.     That investigation was not yet complete at the deadline for payment of compensation under the Massachusetts Wage Act ("MWA"), which requires payment of certain wages after separation that were earned pre-separation.  *See* Mass. Gen. Laws Ann. Ch. 149, §

148.   Accordingly, Capital One made a payment to both Sykes and Wood on September 18, 2020 to comply with the MWA's deadline.  Sykes received $300,000 and Wood received $180,000.

64.   After Sykes and Wood were paid on September 18, Capital One determined, in its sole discretion, that Sykes and Wood were ineligible for any Awards (including the Award payment already made) under the Plans pursuant to Sections VI and VII.  Although the MWA sets the time by which earned compensation must be paid, it does not alter the eligibility requirements for an employee's compensation.

65.   The Appendix of each Plan dictates that "in the event that the amount paid as an Award is greater than the amount actually earned as an Award due to a miscalculation, error, **or any other reason**, Capital One reserves the right to, and each participant agrees that Capital One may, recover from the Participant the full amount of overpayment through any means permitted by law."  (emphasis added.)

66.   Sykes has been overpaid by $300,000 and Wood by $180,000.

67.   Neither Sykes nor Wood is due any further compensation under the Plans.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF DEFEND TRADE SECRETS ACT — 18 U.S.C. 1836
**(All Defendants)**

68.   Capital One hereby realleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth in full herein.

69.   By virtue of their position with Capital One, Defendants obtained access to Capital One's trade secrets and confidential information, including Capital One's customer lists.

70.   Capital One's customer lists constitute information that (a) derives independent economic value from being kept secret; and (b) is the subject of efforts by Capital One that are

14

reasonable under the circumstances to maintain its secrecy.

71.     The customer lists relate to products and services that are intended for use in interstate commerce.

72.     Defendants, by virtue of their positions at Capital One, acquired access to such information under circumstances giving rise to a duty to maintain the secrecy of such information. Defendants explicitly agreed by contract to maintain the secrecy of such information.

73.     Defendants knowingly violated that duty and misappropriated Capital One's customer lists by (a) improperly sending Capital One's customer lists to their personal e-mail accounts; and (b) improperly retaining that information following the termination of their employment with Capital One.

74.     Capital One did not consent to Defendants' use of its customer lists except to perform their duties as employees of Capital One.

75.     Defendants' misappropriation of Capital One's customer lists was also willful and malicious. Defendants used encrypted email systems and/or misleading subject headings to circumvent Capital One's security systems and hide their wrongful acts. Sykes lied to his manager to cover the misappropriation.

76.     Capital One made substantial monetary investments to develop the customer lists.

77.     Defendants have been unjustly enriched by their misappropriation of Capital One's customer lists.

78.     Defendants have received benefits and value from their use of the customer lists at a competitor of Capital One that, in equity and good conscience, they ought not retain.

79.     As a direct and proximate result of these actions, Capital One has suffered and is suffering injury including, among other things, threats to the integrity of its trade secrets, loss of

goodwill and business reputation, disruption of business, threat to enforcement of reasonable contracts, creation of uncertainty regarding Capital One's business, present and future economic loss and other damages in an amount to be proven at trial.

80.     Capital One prays that this Court enter judgment in its favor against Defendants for their violation of the Defend Trade Secrets Act and award Capital One (a) temporary and permanent injunctive relief, (b) compensatory damages in an amount to be proven at trial, (c) damages for unjust enrichment in an amount to be proven at trial, (d) exemplary damages, and (e) such other and further relief as this Court deems just and proper.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Defendants)**

81.     Capital One hereby realleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth in full herein.

82.     By virtue of their employment with Capital One, Defendants owed a fiduciary duty of loyalty and fidelity to Capital One's interests. At all times during the course of their Capital One employment, they were obligated to act solely and exclusively in Capital One's best interests and were prohibited from acting in a manner contrary to Capital One's legitimate business interests.

83.     Defendants knowingly violated that duty and misappropriated Capital One's trade secrets by (a) improperly sending Capital One's customer lists to their personal e-mail accounts; and (b) improperly retaining those lists following the termination of their employment with Capital One.

84.     Capital One did not consent to Defendants use of its trade secrets except to perform their duties as employees of Capital One. Defendants' misappropriation of Capital One's

trade secrets was also willful and malicious.

85.     Capital One made substantial monetary investments to develop its customer lists.

86.     Defendants have been unjustly enriched by their misappropriation of Capital One's trade secrets.

87.     Defendants have received benefits and value from their use of the customer lists that, in equity and good conscience, they ought not retain.

88.     As a direct and proximate result of these actions, Capital One has suffered and is suffering injury including, among other things, threats to the integrity of its trade secrets, loss of goodwill and business reputation, disruption of business, threat to enforcement of reasonable contracts, creation of uncertainty regarding Capital One's business, present and future economic loss and other damages in an amount to be proven at trial.

89.     Capital One prays that this Court enter judgment in its favor against Defendants for their violation of their fiduciary duty to Capital One and award Capital One (a) temporary and permanent injunctive relief, (b) compensatory damages in an amount to be proven at trial, (c) damages for unjust enrichment in an amount to be proven at trial, (d) punitive damages, and (f) such other and further relief as this Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT – CWP AGREEMENTS
### (All Defendants)

90.     Capital One hereby realleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth in full herein.

91.     Defendants' CWP Agreements are valid and binding contracts.

92.     Defendants have willfully, intentionally, in bad faith and in gross violation of their express provisions and accepted standards of business ethics and integrity, breached the CWP

Agreements by misappropriating Capital One's trade secrets.

93.     The CWP Agreements provide for, without limitation, temporary, preliminary, and permanent injunctive relief, return of property, costs and expenses, including reasonable attorneys' fees.

94.     As a direct and proximate result of these actions, Capital One has suffered and is suffering injury including, among other things, threats to the integrity of its trade secrets and confidential information, loss of goodwill and business reputation, disruption of business, threat to enforcement of reasonable contracts, creation of uncertainty regarding Capital One's business, present and future economic loss and other irreparable damages for which it has no adequate remedy at law.

95.     Accordingly, Capital One prays that this Court enter judgment in its favor against Defendants on its claim of breach of contract and award it (a) temporary and permanent injunctive relief, (b) compensatory damages in an amount to be proven at trial, (c) its attorneys' fees and costs, and (d) such other and further relief as this Court deems just and proper.

**COUNT IV**
**BREACH OF CONTRACT- CAPITAL ONE MULTIFAMILY FINANCE**
**ORIGINATOR INCENTIVE PLAN**
**(Sykes and Wood)**

96.     Capital One hereby realleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth in full herein.

97.     The Capital One Multifamily Finance Originator Incentive Plan signed by Sykes is a valid and enforceable contract.

98.     The Capital One Multifamily Finance Originator Incentive Plan signed by Wood is a valid and enforceable contract.

99.     Under the Plan, Capital One has the "sole discretion" to determine whether any

activities "do not comply with the letter and spirit of applicable laws and regulations." Section VII.

100.     Under Section VI(E) of the Plan ("No Violation of Law, Ethics, or Policy"), "A Participant cannot earn an Award if the Participant engages in any violation of any federal, state, or local law or Capital One policy, procedure, or Code of Business Conduct and Ethics that pertain to his/her work duties…"

101.     Capital One has determined in its sole discretion that Sykes' and Wood's misappropriation of Capital One's trade secrets, confidential information, and work product violates Section VI(E).  Sykes's egregious lies to his manager likewise violated Section VI(E). They are therefore ineligible for an Award under the Plan.

102.     The Appendix of each Plan dictates that "in the event that the amount paid as an Award is greater than the amount actually earned as an Award due to a miscalculation, error, or any other reason, Capital One reserves the right to, and each participant agrees that Capital One may, recover from the Participant the full amount of overpayment through any means permitted by law."

103.     Capital One has paid Sykes $300,000 and Wood $180,000 in Awards for which they are ineligible due to their breach of contract.

104.     Accordingly, Capital One prays that this Court enter judgment in its favor against Sykes and Wood on its claim of breach of contract and award it (a) compensatory damages of $300,000 against Sykes and $180,000 against Wood, (b) pre- and post-judgment interest, and (c) such other and further relief as this Court deems just and proper.

## COUNT V
## DECLARATORY JUDGMENT
### (Sykes and Wood)

105.     Capital One hereby realleges and incorporates by reference the allegations

19

contained in the preceding paragraphs as if set forth in full herein.

106. The Capital One Multifamily Finance Originator Incentive Plan signed by Sykes is a valid and enforceable contract.

107. The Capital One Multifamily Finance Originator Incentive Plan signed by Wood is a valid and enforceable contract.

108. Under the Plan, Capital One has the "sole discretion" to determine whether any activities "do not comply with the letter and spirit of applicable laws and regulations." Section VII.

109. Under Section VI(E) of the Plan ("No Violation of Law, Ethics, or Policy"), "A Participant cannot earn an Award if the Participant engages in any violation of any federal, state, or local law or Capital One policy, procedure, or Code of Business Conduct and Ethics that pertain to his/her work duties…"

110. Capital One has determined in its sole discretion that Sykes' and Wood's misappropriation of Capital One's trade secrets, confidential information, and work product violates Section VI(E). Sykes's egregious lies to his manager likewise violated Section VI(E). They are therefore ineligible for an Award under the Plan.

111. The Appendix of each Plan dictates that "in the event that the amount paid as an Award is greater than the amount actually earned as an Award due to a miscalculation, error, or any other reason, Capital One reserves the right to, and each participant agrees that Capital One may, recover from the Participant the full amount of overpayment through any means permitted by law."

112. Accordingly, Capital One prays that this Court enter judgment declaring that Capital One owes neither Sykes nor Wood any Award, compensation, or payment of any kind

under the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Capital One requests that this Court enter judgment:

      (a)     In favor of Capital One and against Defendants Sykes, Wood, and Smits;

      (b)     Enjoining and restraining Defendants from any further violations of the CWP Agreements;

      (c)     Enjoining and restraining Defendants from using, directly or indirectly, Capital One's customer lists and all other Capital One trade secrets, confidential information and work product;

      (d)     Enjoining and restraining Defendants from disseminating Capital One's customer lists and all other Capital One trade secrets, confidential information and work product;

      (e)     Ordering Defendants to account for and return all copies of all trade secret, confidential information, and work product they have misappropriated from Capital One, including all trade secret, confidential information and work product misappropriated by any third parties over which Defendants have control;

      (f)     Ordering Defendants to forensically delete from their electronic systems all information, documents, and electronic data, and all copies thereof, containing any portion of Capital One's trade secrets or Capital One Confidential Information, and to do so through Court-appointed professionals using verification procedures approved by the Court;

      (g)     Awarding damages to Capital One in an amount to be determined at trial;

      (h)     Awarding Capital One pre-judgment and post judgment interest;

      (i)     Awarding Capital One its costs, expenses and attorneys' fees;

      (j)     Awarding Capital One exemplary damages;

(k)     Awarding Capital One punitive damages; and

(l)     Awarding Capital One such other and further relief as the Court deems just and

reasonable.

Dated: September 29, 2020                Respectfully submitted,


                                    CAPITAL ONE FINANCIAL CORPORATION


                                    By:____/s/ Cameron S. Matheson_____
                                       Cameron S. Matheson (VSB No. 47145)
                                       Daniel M. Payne (VSB No. 78912)
                                       Murphy & McGonigle, PC
                                       4870 Sadler Road, Suite 301
                                       Glen Allen, Virginia 23060
                                       Tel:  (804) 762-5332
                                       cmatheson@mmlawus.com
                                       dpayne@mmlawus.com