# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**CAPITAL ONE FINANCIAL CORPORATION,**

     **Plaintiff,**

**v.**                                  **Civil Action No. 3:20cv763**

**BRIAN SYKES, *et al.*,**

     **Defendants.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Plaintiff Capital One Financial Corporation's ("Capital One") Renewed Motion for a Preliminary Injunction (the "Motion"). (ECF No. 52.) In the Motion, Capital One seeks a preliminary injunction based on two claims: (1) violation of the Defend Trade Secrets Act ("Count One"); and, (2) breach of contract ("Count Three"). (Mem. Supp. Mot. 18, ECF No. 53.) Defendants Brian Sykes, Jonathan Wood, and Timothy Smits responded in opposition, (ECF No. 57), and Capital One replied, (ECF No. 59). The Parties appeared before the Court on June 30, 2021 and July 1, 2021 for a hearing on the Motion. This matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[1] For the reasons that follow and as stated from the Bench on July 1, 2021, (*see* ECF No. 74), the Court will grant the Motion because Capital One has made a successful showing for injunctive relief on its breach of contract claim.

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Capital One brings a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836. (Compl. ¶¶ 68–80, ECF No. 1.)

## I. Factual and Procedural Background

In the Summer of 2020, Brian Sykes, Jonathan Wood, and Timothy Smits worked at Capital One before going to work for ORIX—a competitor in the commercial real estate loan industry. The instant dispute concerns information that Defendants[2] created or obtained while working at Capital One and negotiating employment with ORIX, which Defendants then kept for themselves after leaving Capital One or shared with ORIX.

### A. Capital One Seeks a Temporary Restraining Order and a Preliminary Injunction Against Defendants

On September 29, 2020, Capital One filed a five-count Complaint against Sykes, Wood, and Smits. (ECF No. 1.) As explained in the Complaint, "Defendants are former employees of Capital One who were in charge of Capital One's commercial banking office in Boston, Massachusetts." (Compl. ¶ 1, ECF No. 1.) Capital One alleges that Wood, Sykes, and Smits "began looking to leave Capital One as early as January 2020" before ultimately going to work for ORIX. (*Id.* ¶ 23.) As they planned to leave Capital One, Defendants emailed information from their work email accounts to their personal email accounts, forming the basis for this lawsuit. (First Mem. Supp. Mot 8, ECF No. 3.)

Capital One pursues only two of its five counts in the Renewed Motion for a Preliminary Injunction—Count One and Count Three. (Mem. Supp. Mot. 18–21, ECF No. 53.) In Count One, Capital One alleges Defendants violated the Defend Trade Secrets Act ("DTSA") because

---

[2] Throughout this Memorandum Opinion, the Court refers to Sykes, Wood, and Smits collectively as "Defendants." The record demonstrates different levels of culpability among the three individuals; for instance, Smits did not email himself the same materials that Sykes did. Defendants argued at the June 30 and July 1, 2021 Preliminary Injunction hearing that they did not operate as a "team" with Brian Sykes at the helm.

The evidence shows otherwise. For that reason and because Defendants pursued joint representation and plainly worked in concert as part of the Sykes Team, the Court refers to Defendants as a collective unit here. (*See* Oct. 19, 2020 Hr'g Tr. 6 (Counsel for Defendants confirming to the Court that his clients waived any potential issues as to conflicts).)

documents they obtained with customer information "constitute legally protectable trade secrets," (*Id.* ¶ 51), and "Defendants' misappropriation of [such information] was also willful and malicious." (*Id.* ¶ 75.) In Count Three, Capital One alleges that Sykes, Wood, and Smits breached their Confidentiality, Work Product and Non-Solicitation of Employee Agreements ("CWP Agreements") with Capital One by taking confidential information and "misappropriating Capital One's trade secrets."[3] (*Id.* ¶ 92.)

In addition to filing its Complaint, Capital One filed a motion for a temporary restraining order and injunctive relief "because Defendants ha[d] stolen Capital One's confidential customer lists and could solicit and steal Capital One's customers" when emailing work materials to their personal email accounts. (*Id.* 1, 3; *see also* Mot. 1, ECF No. 2.) Defendants responded in opposition to the request for a temporary restraining order and preliminary injunction, and the Court scheduled a hearing on the matter.

---

[3] As to claims not pursued as part of the Preliminary Injunction, Capital One brings a breach of fiduciary duty claim in Count Two and a declaratory judgement claim in Count Five. (Compl. 16, 19.) Capital One did not seek a temporary restraining order or injunctive relief with respect to either of these claims. (Mem. Supp. Mot. 12 n.8.)

In Count Four (Breach of Contract against Sykes and Wood), Capital One alleges that Sykes and Wood violated the terms of their incentive plans, the "Capital One Multifamily Finance Originator Incentive Plan," because they breached the section titled "No Violation of Law, Ethics, or Policy." (Compl. ¶¶ 52, 60.) That section states that "A Participant cannot earn an Award if the Participant engages in any violation of any federal, state, or local law or Capital One policy, procedure, or Code of Business Conduct and Ethics that pertain to his/her work duties." (*Id.* ¶ 60.) The determination of whether any activities "do not comply with the letter and spirit of applicable laws and regulations" is in "Capital One's sole discretion." (*Id.* ¶ 61.) Capital One contends Sykes must return a $300,000 payment and Wood must return a $180,000 payment because of their incentive plan breach of contract. (*Id.* ¶ 103.) Sykes subsequently filed two Counterclaims against Capital One, one for breach of contract and one for violating the Massachusetts Wage Act, based on Capital One's decision to withhold related incentive payments. (Counterclaim, ECF No. 68.) These three additional claims and Defendants' counterclaims are not the subject of the injunctive relief Capital One seeks here.

**B. After a Hearing on the Initial Motion for a Preliminary Injunction, the Court Orders that the Parties Conduct Limited Discovery Regarding the Information Defendants Obtained While at Capital One and Transferred to their Personal Email**

On October 19, 2020, this Court heard argument on Capital One's Motion for a Temporary Restraining Order and Preliminary Injunction. (Oct. 19, 2020 Hr'g Tr., ECF No. 26.) During the hearing, the Court heard from both Parties regarding some of the confidential information at issue, which Capital One claimed Defendants improperly took themselves or shared directly with ORIX. In response to Capital One's accusations, Counsel for Defendants stated that his clients would be happy to return to Capital One the materials that they had sent to their personal email accounts. (*Id.* 20, 71, 75, 79.) Counsel for Defendants further asserted that his clients could delete files from their personal hard drives "where they exist now. And they're there only because I told them not to delete anything after they got this lawsuit, obviously." (*Id.* 22.) Later, Counsel for Defendants explained that his clients shared one document—the originator sales marketing plan—with ORIX, but "it has been there and it has not been accessed by anybody. It hasn't been used by anybody. So I want to be very clear about that. . . . It's really nothing there that is of interest, candidly, to anybody, I don't think." (*Id.* 27.)

Toward the end of the hearing, Counsel for Defendants reiterated that in regard to the loan list and the maturing loan list, (two documents that are discussed in more detail below), Sykes took the materials "[i]n part . . . to track his own income because his compensation is commission based, . . . And [Sykes] is willing to give it back to them, both of those two documents." (*Id.* 71.) Counsel for Defendants "represent[ed] to the Court that nobody that I represent will do anything with any of the documents that I've just listed, of course not the contact list, because they're going to continue to try to do business, but everything else, and I

think we're going to be able to work all that out without this Court having to enter an order at all." (*Id.* 80.)

Recognizing the limited record at that time, the Court denied the temporary restraining order, refrained from ruling on the preliminary injunction, and ordered limited discovery. (*Id.* 96–100.) Regarding the trade secrets claim in Count One, the Court observed that "business customer lists can be protected as trade secrets, but not all customer lists qualify for this protection." (*Id.* 92.) As a result, the Court stated that "[w]hether the customer lists are trade secrets likely will require . . . a fact intensive inquiry, which the Court cannot determine on this limited record in a manner that justifies granting a temporary restraining order or a preliminary injunction." (*Id.*) Regarding the breach of contract claim in Count Three, the Court acknowledged that it was not clear that Defendants "violated a law, ethic, or policy when they emailed documents to their personal email accounts during the COVID-19 pandemic" because of ongoing telework. (*Id.* 100.) While Capital One showed the existence of a valid and binding contract, the Court noted that "further factual development may show a violation or breach of the contractual obligation" and "injury or harm caused by the [D]efendant's breach" to satisfy the three elements for a breach of contract claim (*Id.* 101.) This finding flowed from representations made by Counsel for Defendants during the hearing, including that Defendants had not taken any loans they had at Capital One to ORIX when arguing a lack of irreparable harm.

The Court explained that it was not making a "final ruling as to the preliminary injunction because [it did not] have a basis to grant it or deny it on [such a limited] record. [The Court left] it open for purposes of discovery. . . . Either it might be or it might not be, but that will depend on what discovery shows." (*Id.*) Nonetheless, the Court warned Defendants that "to

the extent the defendants are saying they haven't given anything to ORIX, they certainly would support their defense better if there were some independent confirmation of that because that is obviously Capital One's main concern." (*Id.* 107.) The Court explained that Counsel for Defendants "could not articulate tick by tick what was or was not around and in what form, and that's really what this expedited discovery is meant to address." (*Id.*)

The Parties conducted expedited discovery, and on December 18, 2020, Capital One filed its Renewed Motion for Preliminary Injunction. (ECF No. 52.) On June 30, 2021 and July 1, 2021, the Court held a two-day hearing on Capital One's Renewed Motion for Preliminary Injunction. During the hearing, the Court heard testimony from Kate Byford, Capital One's corporate representative; Michael Chlopak, Capital One's expert witness (*see* ECF Nos. 55, 73); Brian Sykes; and Mitchell Goldenberg. The Court also admitted seventy-five exhibits, including nine excerpts of deposition testimony that the Parties submitted as joint exhibits,[4] and excerpts from two video depositions.[5]

In contravention to Counsel for Defendants' representations to the Court at the October 2020 hearing, discovery revealed that Defendants could not simply "return" the loan list, maturing loan list, marketing plan, customer lists, or other materials to Capital One because such

---

[4] The Court cites to the joint exhibits as "Jt. Ex." when referring to deposition testimony. Joint Exhibits 1 and 2 contain testimony from Phyllis Klein, Joint Exhibit 3 contains testimony from Charlie Mentzer, Joint Exhibit 4 contains testimony from Joel Miller, Joint Exhibits 5 and 6 contain testimony from Brian Sykes, Joint Exhibit 7 contains testimony from Jonathan Wood, Joint Exhibit 8 contains testimony from Timothy Smits, and Joint Exhibit 9 contains testimony from Michael McNeill.

[5] The Parties supplied a Joint Exhibit and Witness List prior to the hearing. (ECF No. 66.) The Court cites to the exhibit numbers as admitted during the hearing on the Renewed Motion for Preliminary Injunction. Because the Court seeks to act quickly in issuing this Memorandum Opinion, the transcript for the two-day hearing is not yet available for citation. Once available, the transcript will provide a more complete record regarding the citations for the evidence presented and the Parties' arguments.

information had already been shared with ORIX. As discussed below, loans that Defendants diverted to ORIX closed in September 2020, before Capital One filed its Complaint on September 29, 2020 and before Counsel for Defendants appeared at the October 19, 2020 hearing. Additionally, the customer lists at issue had been loaded into ORIX's client database, HubSpot, prior to the October 19, 2020 hearing. Counsel for Defendants nonetheless implied that Defendants could simply delete these materials from their hard drive or return them to Capital One without harm.

This was not accurate on October 19, 2020. Considering that the Parties appeared before the Court three weeks after the Complaint was filed, that fact was readily discernable with even a modicum of diligence. The Court does not look favorably on misrepresentations of the record. Furthermore, the Eastern District of Virginia expects and always requires candor to the tribunal. *See* Va. R. Prof. Conduct 3.3 cmt 8. ("A lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, but the lawyer cannot ignore an obvious falsehood."). The Court anticipates diligence, preparedness, and complete forthrightness from Defendants moving forward.

With this background in mind, the Court recounts the facts pertinent to the Motion as presented during the two-day hearing and in the Parties' briefs.

### C. Defendants Enter Confidentiality, Work Product and Non-Solicitation of Employee Agreements with Capital One

Defendant Brian Sykes worked for Capital One in its Boston office from August 2010 through August 2020. (Counterclaim ¶¶ 9–10, ECF No. 68.) Defendant Jonathan Wood worked for Capital One in its Boston office from 2010 until August 2020, and Defendant Timothy Smits worked for Capital One in its Boston office from 2013 until June 2020. (Wood Answer, ECF No. 50; Smits Answer, ECF No. 51.) While at Capital One, Sykes led a team that included

Wood and Smits, along with Michael McNeill and Mitchell Goldenberg (the "Sykes Team").[6] The Sykes Team originated commercial real estate loans that Capital One funded and Fannie Mae partially guaranteed or Freddie Mac purchased.

As part of their employment, Defendants entered CWP Agreements with Capital One. (Pl.'s Exs. 1, 2, 3.) In entering the CWP Agreements, Defendants agreed not to use or divulge Confidential Information for their own benefit or the benefit of others:

> In exchange for Capital One's agreement and promise to provide you with access or continuing access to its Confidential Information, including Confidential Information you develop for Capital One, you agree and promise that, during your employment with Capital One and at all times thereafter, you will not use for your own benefit or for the benefit of others (including in any future employment, work, or business), or divulge to others, in any manner whatsoever, any of Capital One's Confidential Information, except for your work for Capital One or as expressly authorized by Capital One.

CWP Agreements § 1.a. The CWP Agreements define Confidential Information as:

> [I]nformation, knowledge, data, specialized training or other information that derives actual or potential value from the fact that it is not generally known to members of the general public, which concerns the business or affairs of Capital One or Capital One's customers. *Confidential Information includes, but is not limited to, information relating to any line of business regarding business plans and strategies, products, Work Product, Trade Secrets, test results, discoveries, customer lists, information regarding customer needs and preferences and Capital One's strategies for satisfying them*[] . . . .

CWP Agreements § 12.a (emphases added).

Capital One also had policies and procedures addressing protection of confidential information. The Information Handling Procedure describes "expectations for data classification and the minimum requirements for handling of information to ensure protection[.]" (Pl.'s Ex. 4.)

---

[6] Due to the forum selection clauses in their contracts, Capital One filed suit against McNeill and Goldenberg in Delaware. (Mem. Supp. Mot. 2 n.1.) The Delaware Chancery Court subsequently enjoined McNeill and Goldenberg as part of that state court action. (Opp'n 17 n.7, ECF No. 57.)

Pursuant to the Information Handling Procedure policy, Capital One sorts information into five categories: (1) Confidential/Proprietary; (2) Confidential; (3) Company; (4) Public; and, (5) Not Required/Excluded. (*Id.*) The "Confidential/Proprietary" classification means "information that, if inappropriately disclosed, altered or destroyed, may have a material negative impact to Capital One, has legal or regulatory requirements to protect the information, or gives Capital One competitors an advantage." (*Id.* 2.) Capital One flags "pre-deal information" as information that should be "Confidential/Proprietary." (*Id.* 6.)

In a different policy, the End User Responsibilities and Acceptable Use Standard, Capital One requires that its employees must "maintain the proper level of protection over Capital One computing assets and information while performing day to day activities." (Pl.'s Ex. 5.) Section 4 of that standard addresses email. Section 4.5 states:

> Do not send Company, Confidential, or Confidential/Proprietary information to personal or web-based email addresses such as Yahoo mail, Hotmail or Gmail except for general, non-sensitive correspondence with customers as outlined in the Information Handling Procedure.

(*Id.* 4.) Section 4.6 of the Acceptable Use Standard states:

> Do not use non-Capital One email addresses to conduct Capital One Business, including but not limited to, forwarding or auto-forwarding Capital One emails or meeting invites (e.g., forwarding Capital One emails to personal inbox).

(*Id.*) Section 4.7 of the same Acceptable Use Standard provides: "Do not send Confidential or Confidential/Proprietary information via email to third party recipients unless authorized and ensure it is appropriately secured using encryption." (*Id.*) Additionally, Capital One requires annual computer-based training on cybersecurity, which Sykes, Wood, and Smits completed in 2019. (Pl.'s Exs. 47, 48, 49.)

### D. Sykes, Wood, and Smits Negotiate with ORIX While Working for Capital One, Discuss Potential Loans and Customers, and Receive Large Signing Bonuses From ORIX

Capital One's claims turn on information Defendants acquired by sending materials from their work email accounts to their personal email accounts between March 2020 and August 2020 while negotiating employment with ORIX and their respective departures from Capital One.

On June 24, 2020, Smits resigned from Capital One. Shortly thereafter, Smits began working at ORIX. Two months later, on August 17, 2020, Sykes and Wood resigned from Capital One. (Opp'n 13, 18, ECF No. 57.) A few days later, Sykes and Wood began working at ORIX. (*Id.*) During this period, Defendants were negotiating the terms of their employment with ORIX. Defendants worked with John Rosata, a recruiter, to help with their transition from Capital One to ORIX. (*See* ECF No. 57–4.) In an affidavit, Rosata stated that "[i]n October of 2019, Mr. Smits called [him] and asked [him], confidentially, if [Rosata] would assist him in a potential move to another multifamily agency lender. [Rosata] agreed to do so." (*Id.* 2.) Rosata helped Sykes move to ORIX as well. (*Id.* 3.)

During the negotiation period in May and June of 2020, Wood recognized in an email to Sykes and Smits that the potential calling area restrictions were "a big red flag" and that it "could become a problem in the future especially as I'm trying to build my business. Our client list, if we get those blessed might give me more comfort." (Pl.'s Ex. 9.) The calling area referred to the geographic region in which Defendants could solicit customers on behalf of ORIX. Wood wanted to provide ORIX with his Capital One customer list and get ORIX's permission to continue contacting those Capital One clients without regard to his predetermined calling area. (Wood Dep. 49–50, Jt. Ex. 7.) Wood provided a client list to ORIX, which ORIX approved

using in part. (*Id.* 50–51.) At the same time, Rosata and Sykes had discussed in an email that the industry standard included a 90 day non-compete period and there is "no need to negotiate [for a shorter non-compete period] when [ORIX is] paying a lot for them to come over." (Pl's Ex. 9.) Recognizing that it would take several months to build their business, ORIX gave Sykes, Wood, and Smits significant one-time signing bonuses in addition to their new base salaries. (Pl.'s Exs. 54, 55, 56; Sykes Dep. 48–49, Jt. Ex. 5.) Sykes also discussed "side agreements" with members of his team wherein they would split commissions. (Pl.'s Ex. 9; McNeill Dep. 144, Jt. Ex. 9.)

In a May 22, 2020 email from Sykes to Wood and Rosata, titled "Deals we are leaving behind," Sykes mentioned that he could not bring a certain deal with him to ORIX because it is "just too risky at this stage given it is already quoted" by Capital One. (Pl.'s Ex. 8.) In his deposition, Sykes testified about that email, stating that he was trying to determine whether he "could get compensated on any deals that we're working on at Capital One if we were decide to leave." (Sykes Dep. 229, Jt. Ex. 6.) Sykes said that he could not "take a loan that's already in place and then take the loan that's already signed up and move it over there [to ORIX because it] would be inappropriate." (*Id.* 230.) Because Sykes earned commission, he wanted to see if ORIX "would give us some credit for these deals," but ORIX decided not to. (*Id.* 231.)

E.   **The Information Defendants Obtained from Capital One Before Departing**

Capital One seeks to enjoin Defendants from using approximately thirty of the exhibits presented at the hearing on the Renewed Motion for Preliminary Injunction. The Court summarizes key components of the exhibits at issue below. The exhibits include emails, attachments, customer lists, and spreadsheets Defendants obtained while working at Capital One.

## 1. **The Loan List**

On March 26, 2020, Sykes sent an email from his Capital One email account to his personal email account attaching a loan list (the "Loan List").[7] (Pl.'s Ex. 18; Sykes Dep. 119–20, Jt. Ex. 5.) Sykes stated in his deposition that he sent that list to himself because it provided the names of the asset managers for all loans with which Sykes was involved, and he needed to be able to direct them to the correct manager if the borrowers requested loan forbearances. (Sykes Dep. 120–21.) The Loan Lists spans several spreadsheet pages and "[i]n addition to the identity of the asset manager, [it] contains . . . loan numbers, property names, property addresses, note changes, original balances, current balances, lien positions, risk ratings, interest rates, servicing fee rates, guaranty rates, sponsor names, and the maturity dates of the loan." (Mem. Supp. Mot. 19.) Sykes testified that he needed the Loan List because it included "every loan that [he had] some involvement with," and he needed to know who to send his clients to if they contacted him. (Sykes Dep. 120.)

---

[7] To send these materials to their personal email accounts, Defendants had to override Capital One's security system blocking their emails to a non-person Capital One account. (Compl. 10.) For instance, on June 5, 2020, Wood sent an email to his personal email address under the subject "Little League." (*Id.*) Wood attached several files concerning baseball as well as his bio, "brag sheet," "JKW Clients & Prospects" and "Jon Wood Business Outline," appearing to hide these work-related items in an email about baseball. (*Id.*) On June 22, 2020, Smits sent an email from his Capital One email address to his personal email with a spreadsheet that contained detailed client contact information. (*Id.*) Smits immediately received an automatically generated email from Capital One's Data Loss Prevention system notifying him that his email was blocked. (*Id.*) Smits then had a coworker send him the same attachment shortly thereafter using Capital One's encrypted email system. (*Id.* 11.)

Defendants also flouted Salesforce, a platform that Capital One uses to maintain confidential client information. Salesforce incorporates security measures such that producers, like Defendants, can only see the information for the client with whom they work after logging on. (Smits Dep. 44.) Salesforce prevents producers from seeking client information associated with other Capital One producers. (*Id.*) ORIX uses a system known as HubSpot that is akin Salesforce and is similarly used to protect client information.

## 2. **The Maturing Loan List**

One week later, on April 3, 2020, Sykes sent an email from his Capital One email account to his personal email account, attaching a list of maturing loans (the "Maturing Loan List"). (Pl.'s Ex. 20; Sykes Dep. 121–22.) The Maturing Loan List contains three tabs and bears a label on the first tab that identifies the workbook as "confidential and/or proprietary to Capital One and/or its affiliates and may only be used solely in performance of work or services for Capital One." (Pl.'s Ex. 20.) In his deposition and again during the Preliminary Injunction hearing on June 30, 2021, Sykes testified that he agreed with the label concerning confidentiality on the first tab. (Sykes Dep. 126–27.) The second tab includes a list of available deal sponsors, available asset managers, and available producers. (Pl.'s Ex. 20.) The list of available deal sponsors includes the names of 746 borrowers, some of which were clients of Capital One producers other than Sykes. (Mem. Supp. Mot. 20.) In other words, the list of customers on the Input Tab constitutes the information contained on the Maturing Loan List that Sykes did not already have from the Loan List he sent himself one week earlier. (*See* Pl.'s Ex. 20.) McNeill stated in his deposition that these customers represented "new leads" for the Sykes team to pursue while at ORIX because the Sykes Team no longer had to compete for them with other producers at Capital One. (McNeill Dep. 163.)

## 3. **The Marketing Plan and Client Lists Contained in That Plan**

On May 20, 2020, Sykes sent an email from his Capital One email account to his personal email account that contained a spreadsheet titled "Originator Sales_Marketing Plans – B. Sykes J. Wood" (the "Marketing Plan"). (Mem. Supp. Mot. 18.) The Marketing Plan is an Excel spreadsheet with eight individual tabs: (1) Originator Marketing Strategy; (2) Prospects, Marketing Sales Plan; (3) Clients, Marketing Sales Plan; (4) Follow-up; (5) Contact List;

(6) Prospect List; (7) Client List; and, (8) Blackfin. (Pl's Ex. 14.) The Contact List contains roughly fifty company names, individual names and information for points of contacts, and addresses. (*Id.*) The Prospect List contains roughly 150 company names, individual names and information for points of contacts, and addresses. (*Id.*) The Client List contains roughly eighty company names. (*Id.*) The Prospects, Marketing Sales Plan tab contains information regarding eight multifamily housing units, describing the number of units owned, product type, existing lender relationships, upcoming opportunities, 2019 closed volume, 2020 estimate volume, and capital source. (*Id.*) The Client, Marketing Sales Plan contains information regarding ten multifamily housing units, which similarly contained information regarding the number of units owned, product type, existing lender relationships, upcoming opportunities, 2019 closed volume, 2020 estimate volume, and capital source. (*Id.*)

### 4. The HubSpot Client List

On August 24, 2020, Wood emailed the Marketing Plan from his personal email account to his ORIX email account and Sykes's ORIX email account. (Wood Dep. 97–98.) Wood then asked his assistant at ORIX to transfer the contact information from the Marketing Plan into HubSpot, the system that ORIX used to store client information.[8] (*Id.* 95–97.) As a result, ORIX now holds a list of clients and prospective clients pulled from the Marketing Plan that Sykes and Wood provided after Sykes sent it from his Capital One email account to his personal email account. (*Id.*) During the hearing on the Motion, Capital One introduced that contact list and showed that it includes 169 names, approximately 40 of which are people whom Sykes has known for more than 10 years. (Pl.'s Ex. 16.)

---

[8] Sykes similarly testified during the Preliminary Injunction hearing on June 30, 2021 that he asked his assistant to upload these contacts into HubSpot for him. The exhibit lists Brian Sykes and John Wood as the "contact owners" of the customer information. (Pl.'s Ex. 16.)

## 5. Capital One Presents Evidence that Defendants Diverted Deals to ORIX While Working for Capital One

At the hearing, Capital One presented a list of seven deals, prepared by ORIX, that Defendants closed at ORIX between September 1, 2020 and December 1, 2020. (Pl.'s Ex. 21.) Capital One asserts that in 2020 Defendants improperly diverted six of these seven deals from Capital One to ORIX.[9]

Three loans—Wyndham Park, Spring Hill, and Parke Place Village—pertain to Forest Properties. On May 22, 2020, prior to leaving Capital One, Sykes forwarded information from Capital One to his personal email account regarding a loan for Magnolia Estates by Forest Properties. (Pl.'s Ex. 10.) The email contained a "Bridge-to-Agency Quote Narrative" for Magnolia Estates, showing property information, sponsor and management information, the requested debt structure, the requested general terms for the loan amount provided by the borrower, the requested fee structure, client relationship information that recognized Sykes' "successful relationship with the client throughout the past 20 years," future business opportunities, lending competition, transaction strengths, transaction risks, sponsor analysis, property analysis, and underwriting analysis. (*Id.*) Sykes then forwarded the email containing the Quote Narrative[10] from his personal email account to ORIX. (Pl.'s Ex. 11.)

Roughly four months later, in August 2020 and while still working at Capital One, Sykes

---

[9] Capital One does not assert that Defendants diverted a seventh loan for Timber Ridge Apartments to ORIX because Defendants did not work on that loan while at Capital One.

Although Defendants inaccurately claimed under oath that they brokered these six loans to ORIX because they were bridge loans, ORIX identified the product type for each loan as either a Fannie Mae Conventional Loan or a Freddie Mac Conventional Loan. (Pl.'s Ex. 21.)

[10] Quote Narratives contain public information about prospective properties and private analysis concerning potential loans (pre-deal information or a prescreen narrative). (Mem. Supp. Mot. 6.) Defendants claim that Quote Narratives contain only public information but, as discussed later, the record shows otherwise.

participated in a conference call with McNeill, who was working at ORIX by that time, and a loan sponsor to discuss options for ORIX to provide loans on four Forest Properties. (Pl.'s Ex. 44.) On August 11, 2020, McNeill sent an email from his ORIX account titled "Forest Properties 2020 4-Pack: Fannie Mae Quote Review" to Dan Sterner, who worked at Forest Properties. (*Id.*) McNeill included Sykes on the email chain by using Sykes' personal email address. (*Id.*) The email contained information regarding pricing and loan options for the four Forest Properties (Parke Place, Spring Hill, Wyndham Park, and Ranch Lake). (*Id.*) Three of these four refinance loans—Wyndham Park, Spring Hill, and Parke Place Village—closed at ORIX. (Sykes Dep. 220–21.) Ranch Lake required additional Housing and Urban Development ("HUD") review and remains in the ORIX pipeline. (*Id.* 221.)

In his deposition, Sykes asserted that he was assisting McNeill with these Forest Property loans because he had "known this client since 1997, . . . and I . . . let them know that I wasn't sure what my future would be at Capital One long term before this, and—as someone I've known for years, and I didn't think it was a transaction—this client had followed me from place to place." (Sykes Dep. 220.) Sykes further stated that Forest Properties "gave [McNeill] the deal because of the again, once again, impressed with the bridge loan that was offered to them on Magnolia Estates. . . . Meanwhile, while this is going on, I didn't have time to try to steal these deals back from Capital One because I was in the middle of trying to close $80 million dollars on behalf of Capital One and wanted to focus on getting those deals completed, closed and all set during that same time." (*Id.*) Sykes and Forest Properties did not present these loan opportunities to Capital One. (*Id.* 220.)

Capital One presented evidence about additional deals diverted to ORIX while Defendants continued to work at Capital One and to negotiate their employment at ORIX. On

May 21, 2020, while still at Capital One, Smits sent an email to ORIX about two deals in the Capital One pipeline, Life at Pine Village and the Avenues at IUPUI. (Pl.'s Ex. 37.) Five days later, on May 27, 2020, ORIX requested from Smits "source documents, monthly T-12 [trailing twelve-month operating statements for the two deals] and rent rolls," which Smits provided.[11] (Id.) On May 28, 2020, John Rosata, with Smits and Sykes copied on the email, sent the information requested to ORIX. (Id.) Smits did not obtain permission from Capital One to transmit this information to ORIX, nor was he authorized to broker these deals for Orix. (Smits Dep. 66–68.) The Life at Pine Village deal later closed at Capital One after Smits went to work for ORIX. (Id. 74.)

On June 16, 2020, eight days before giving his resignation notice to Capital One, McNeill sent information from his Capital One email account to his personal email account regarding a loan for a property called Bayou on the Bend. (McNeill Dep. 105, Jt. Ex. 9.) The email included a Quote Narrative, rent roll, and an operating statement for Bayou on the Bend. (Id. 105–06.) McNeill then forwarded the information from his personal email account to ORIX. (Id. 108–09.) At this time, Sykes worked at Capital One, but communicated with McNeill about the work he was doing for Bayou on the Bend. (Sykes Dep. 256.) McNeill copied Sykes on the relevant correspondence for Bayou on the Bend, and Sykes discussed with McNeill and ORIX flood insurance issues for the property. (Pl.'s Ex. 43.) The Bayou on the Bend deal, which involved a $34,173,000 Freddie Mac Conventional Loan, closed at ORIX on September 4, 2020. (Pl.'s Ex. 21.) Sykes and McNeill split commission for the deals on which they worked, including the ones that McNeill closed while at ORIX. (McNeill Dep. 144; Wood Dep. 210–12.)

---

[11] Rent rolls provide information regarding the tenants in the building. (Mem. Supp. Mot. 11 n.20.) Trailing twelve-month operating statements provide data from the past twelve consecutive months for reporting financial figures.

### 6. **Capital One Presents Expert Evidence Regarding Damages and Harm**

At the hearing on the Motion, Capital One presented an expert report and testimony from Michael Chlopak regarding the confidentiality of pre-deal information, the steps Capital One undertakes to maintain the secrecy of its confidential information, industry practice regarding pre-deal information, and harm Capital One suffered as a result of this information being shared. (*See generally* Pl.'s Ex. 46 "Chlopak Report.") Chlopak testified that a competitor who knows how Capital One analyzes and structures deals can use that information not only to attempt to outbid Capital One, but also to improve their own competitiveness in the marketplace without undertaking the expense and effort of their own research to achieve the same result. (*Id.* 13.) Chlopak further testified that Quote Narratives "contain proprietary research and analysis of Capital One in connection with their evaluation of whether and what terms to bid on a deal" and are not publicly available. (*Id.*)

Chlopak explained that Capital One, in line with industry standards, takes reasonable steps to maintain the secrecy of its Quote Narratives and customer lists. (*Id.* 15–16.) Capital One requires employees with access to these highly confidential documents to enter CWP Agreements. (Pl.'s Exs. 1, 2, 3 (CWP Agreements § 1.a).) Capital One implements policies and procedures that require employees to classify and treat pre-deal information regarding commercial transactions as "Confidential/Proprietary." (Chlopak Report 15.) Capital One provides training to employees regarding their obligations to safeguard confidential information. (*Id.* 15–16.) Additionally, "[l]enders such as Capital One are highly regulated entities that are required to maintain the confidentiality of customer information." (*Id.* 19.) "Customers expect lenders like Capital One to protect the confidentiality of their financial information," and Capital One's "reputation as a lender that protects its customer's financial information" suffers when

employees send confidential customer information to another institution without prior authorization. (*Id.*)

Chlopak summarized that, in his opinion, "Defendants secretively extracted from Capital One . . . [information] considered confidential and proprietary pursuant to industry standards." (*Id.* 4.) Defendants "circumvented safeguards put in place by Capital One to protect confidential and proprietary information by sending this information to their personal emails and subsequently forwarding the information to a direct competitor of Capital One." (*Id.*) "Defendants' sharing of this confidential business information to a direct competitor put Capital One at an immediate disadvantage in an already highly-competitive niche market," and caused reputational and regulatory risk to Capital One. (*Id.* 5.)

## F.    Capital One Seeks Injunctive Relief on Two of its Five Counts

In the Renewed Motion for Preliminary Injunction, Capital One argues that it is likely to succeed on the merits of its DTSA claim and breach of contract claim. (Mem. Supp. Mot. 21.) Capital One posits that this case "involves two trade secrets: (1) the pre-deal information taken by Defendants; and (2) the customer lists taken by Defendants." (*Id.*) Capital One claims that the "pre-deal information taken by Defendants—specifically the quote narratives—are trade secrets of Capital One." (*Id.* 22.) According to Capital One, quote narratives, which contain Capital One's underwriting analysis, are not publicly available and derive independent economic value from not being known to competitors. (*Id.*) Capital One further argues that the customer lists Defendants obtained are trade secrets because Capital One compensates producers to generate and develop those lists, which takes years of work. (*Id.*)

In any event, Capital One argues that Defendants breached their CWP agreements because confidential information, as defined in those contracts, includes "'customer lists' and

'Capital One's strategies for satisfying' customer needs." (*Id.* 25.) Capital One argues it suffered damage for this breach because "Defendants divulged to ORIX information used by lenders to construct bids for deals." (*Id.* 29.) Capital One contends that "ORIX has closed six deals that Defendants diverted to ORIX." (*Id.*) If Defendants continue using the confidential information obtained from Capital One, ORIX may be able to secure bids that are more competitive than what Capital One may offer. (*Id.*)

In response, Defendants argue that through "the guise of a Rule 65 motion" Capital One asks this Court "to create a non-compete clause in employment contracts that Capital One had with Brian Sykes, Jonathan Wood and Timothy Smits that does not exist." (Opp'n 1, ECF No. 57.) Defendants further contest whether the materials obtained amount to trade secrets or proprietary information because it is "publicly available to, and regularly used by, anyone in this industry." (*Id.* 3.) Defendants claim that the customer lists are primarily comprised of personal contact information, and as a result the lists "reflect information generally known in the industry and the general public" and "do not involve trade secrets." (*Id.* 28.) Defendants also contend that Capital One cannot show it has suffered harm to prevail on its claims because "[a]ll of the loans that Capital One claims were 'diverted' were actually lost in the marketplace and handled in ways that are standard in the industry." (*Id.* 30.) Moreover, "money damages would fully compensate [Capital One] for its provable losses," weighing against the need for injunctive relief. (*Id.*) Capital One replied, (ECF No. 59), and the Court heard testimony and argument concerning the Motion.

At the conclusion of the two-day hearing, the Court granted Capital One's Renewed Motion for Preliminary Injunction. The Court entered an Order memorializing the terms of the

preliminary injunction. (July 1, 2021 Order, ECF No. 74.) This Memorandum Opinion provides the reasons for granting the injunction.

## II. Standard of Review

"Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). "Both are 'extraordinary remedies involving the exercise of [a] very far-reaching power to be granted only sparingly and in limited circumstances.'" *Id.* (quoting *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001)).

"The standard for granting either a TRO or a preliminary injunction is the same." *Id.* (citation omitted). A party seeking either form of injunctive relief "must establish [1] that he [or she] is likely to succeed on the merits, [2] that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his [or her] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts within the jurisdiction of the Fourth Circuit require that each of these factors be "satisfied as articulated." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citation omitted). "Accordingly, courts considering whether to impose [either a TRO or a preliminary injunction] must separately consider each *Winter* factor." *Id.* at 321.

To obtain injunctive relief, plaintiffs bear the burden to show that they are likely to succeed on one of their claims. *W. Industries-North, LLC v. Lessard*, No. 1:12cv177, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) ("[W]here multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief.") (citations omitted). Here, Capital One seeks a preliminary injunction based on Defendants' alleged violation of the DTSA and for breach of contract.

### A.  Defend Trade Secrets Act

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

"To demonstrate misappropriation of trade secrets [under the DTSA], [a plaintiff] must show . . . the existence of a protectable trade secret and misappropriation of that trade secret." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020). "'[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information,' regardless of whether it is tangible or intangible, or how the information is stored, memorialized, or maintained, can qualify for protection as a 'trade secret' under the federal Defend Trade Secrets Act." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020) (quoting 18 U.S.C. § 1839(3)). "However, such information only becomes a trade secret if (1) the owner of the trade secret takes 'reasonable measures to keep such information secret,' and (2) the information 'derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure [or] use of the information.'" *Id.* (quoting 18 U.S.C. § 1839(3)(A)–(B)).

As for misappropriation, the DTSA provides that occurs "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i)." *Teeters*, 441 F. Supp. 3d at 132. "The DTSA further provides that the 'improper means' of acquiring a trade secret 'includes

theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" *Id.* (quoting 18 U.S.C. § 1839(6)(A)).

## B.    **Breach of Contract**

To state a claim for breach of contract under Virginia law, a plaintiff must plausibly allege in federal court: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of the obligation; and, (3) an injury or harm caused by the defendant's breach. *Hardnett v. M&T Bank*, 204 F. Supp. 3d 851, 860 (E.D. Va. 2016), *aff'd sub nom. Hardnett v. M & T Bank*, 699 F. App'x 242 (4th Cir. 2017) (citations omitted). A breach of contract claim based on divulging confidential information does not require a finding that the materials at issue constitute a trade secret:

> [The] breach of contract claims do not require a finding that the materials at issue qualify as a trade secret, because the respective nondisclosure clauses apply to any confidential or proprietary information owned or used by [plaintiff]. This contractual language is broader than the definition of a trade secret under the Act and, thus, the nondisclosure language may apply to the software code and other proprietary materials at issue even if those materials are not covered by the Act.

*Decision Insights, Inc. v. Sentia Grp., Inc.*, 416 F. App'x. 324, 331–32 (4th Cir. 2011) (internal quotation marks omitted).

## III.  **Analysis**

Because Capital One need only show a likelihood of success on one claim to obtain injunctive relief, the Court focuses its analysis on Count Three—the breach of contract claim. Regardless of whether the customer lists and other confidential information at issue constitute trade secrets, Capital One shows a likelihood of success on the merits of its breach of contract claim. After finding that the four factors for injunctive relief weigh in Capital One's favor based on the breach of contract claim, the Court will grant the Renewed Motion for a Preliminary Injunction.

## A. Capital One Shows a Likelihood of Success on the Merits of its Breach of Contract Claim Because the Record Shows Defendants Breached Their CWP Agreements and Capital One Shows Harm from That Breach

Starting with the first *Winter* factor, likelihood of success on the merits, the Court determines that Capital One makes a clear showing of likely success on the merits of its breach of contract claim.

Defendants seemingly do not contest the first two elements of Capital One's breach of contract claim: that valid contracts exist, and that Defendants breached those contracts. As a threshold matter, each Defendant entered a CWP agreement with Capital One. (Pl.'s Exs. 1, 2, 3.) The CWP Agreements expressly define "customer lists, information regarding customer needs and preferences and Capital One's strategies for satisfying them" as confidential information. (*See e.g.*, Pl.'s Ex. 1, CWP Agreement § 1.a.) Defendants do not dispute that they took confidential information in breach of the CWP agreements—including customer lists, Quote Narratives, the Loan List, the Maturing Loan List, and the Marketing Plan—from Capital One and kept it in their personal records or gave the information directly to ORIX. Indeed, Sykes stated during his deposition that he recognized information in the Maturing Loan List labeled as confidential before emailing it to himself, and that doing so allowed him and McNeill to have contact information for "new leads" for customers from other Capital One producers. (Sykes Dep. 126–27; McNeill Dep. 163.)

Defendants instead focus their arguments on damages, primarily asserting that Capital One cannot show that Defendants' actions caused Capital One harm. Defendants argue, for instance, that "Forest [Properties] decided to send [its] deal to ORIX" after learning that Sykes planned to leave Capital One "[b]ecause this is a relationship business." (Opp'n 19.) According to Defendants, "Forest Properties still has a significant portfolio of loans at Capital One," and

"[n]othing prevented Mr. Sterner from choosing to send this deal to ORIX and nothing prevented Capital One from trying to compete to get the next Forest Properties deal." (*Id.* 20.)

Uncontroverted evidence presented at the hearing, however, established that Capital One suffered damages because of Defendants' breach of their CWP agreements and that Capital One did not merely lose loans "in the marketplace" as Defendants suggest.[12] (*Id.* 19.) Sykes identified one example: Forest Properties gave McNeill, who then worked at ORIX, its business on three properties because of the bridge loan offered to them through ORIX on Magnolia Estates. (Sykes Dep. 220.) In August 2020, while still employed at Capital One, Sykes assisted ORIX in closing the loans for three Forest Properties: Spring Hill, Parke Place, and Wyndham Park. (*Id.* 219–21.) McNeill and Sykes did not present these loan opportunities to Capital One.

Additionally, Capital One provided a list of seven loans, created by ORIX, that Defendants closed at ORIX between September 4, 2020 and December 1, 2020. (Pl.'s Ex. 21.) Defendants worked on six of these seven deals while at Capital One and diverted those loans from Capital One to ORIX. Moreover, *every* deal Defendants diverted from Capital One, regardless of whether the loans ultimately closed at ORIX, harmed Capital One's business and resulted in damages.

Defendants' breach of contract—the disclosure of confidential information to a direct competitor—also caused Capital One harm because ORIX now holds information regarding how Capital One structures its bids for certain deals, meaning that Capital One must compete for deals with a competitor that has access to Capital One's confidential pre-deal information. For instance, Defendants disclosed Quote Narratives, which contained customer information and

---

[12] The assertion that Capital One has since closed a loan with Forest Properties does not eliminate all harm. (Opp'n 19–20.) A compromised business relationship need not amount to an entirely fractured one.

analysis, along with other pre-deal information such as rent rolls and trailing twelve-month operating statements, which Capital One considers confidential. Apart from arguing about damages to Capital One, Defendants do not truly contest that they shared this information in violation of the valid CWP Agreements in which they entered with Capital One.

Finally, even a few examples of Capital One's pre-deal bidding analysis gives ORIX a competitive advantage in future deals for loans that it would not otherwise have. This is especially true given the fact that for some time Capital One did not know that ORIX had this information.

In sum, Capital One makes a clear showing that: (1) a valid contract exists (the CWPs); (2) Defendants breached duties under specific provisions of that contract (Use/Disclosure of Confidential Information); and, (3) Capital One sustained damages as a result of the breaches (Confidential Information sent to a direct competitor). Because Capital One shows a likelihood of success on the merits of its breach of contract claim, the Court finds that this factor weighs in favor of granting injunctive relief.

## B. Capital One Faces Irreparable Harm in the Absence of Preliminary Injunctive Relief Because Defendants May Otherwise Continue Using the Confidential Information to the Detriment of Capital One

Having determined that Capital One is likely to succeed on the merits of its breach of contract claim, the Court now considers whether Capital One will suffer irreparable harm in the absence of preliminary relief, the second *Winter* factor.

For this aspect of injunctive relief, Capital One must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Integrated Glob. Servs., Inc. v. Mayo*, No. 3:17cv563, 2017 WL 4052809, at *8 (E.D. Va. Sept. 13, 2017). "Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."

*Multichannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551

(4th Cir. 1994) (internal quotation marks and citation omitted), *abrogated on other grounds by*

*Winter*, 555 U.S. at 7. Moreover, "[w]hen the failure to grant preliminary relief creates the

possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable

injury prong is satisfied." *Id.* at 552. However, to satisfy the requirements for a preliminary

injunction, irreparable harm must be "neither remote nor speculative, but actual and imminent."

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotation and

citation omitted). This Court has recognized that "[t]he disclosure of trade secrets establishes

immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'" *Home*

*Funding Grp., LLC v. Myers*, 2006 WL 6847953, *2 (E.D. Va. Dec. 14, 2006) (quoting *Acierno*

*v. New Castle Co.*, 40 F. 3d 645, 664 (3d Cir. 1994)). "The same conclusion logically applies to

the disclosure of confidential information as well." *Id.*

Notwithstanding whether any of the information acquired by ORIX includes trade

secrets, Capital One's breach of contract claim involves the disclosure of confidential

information. Capital One's breach of contract claim rests on Defendants' taking confidential

information, sending it to their personal email, and later disclosing it to ORIX. Specifically,

Defendants disclosed quote narratives, loan information, and customer lists to ORIX. Notably,

Capital One expressly defines customer lists as confidential in the CWP Agreements. Capital

One also labeled such information "confidential" in policies and user agreements, and

Defendants do not dispute that label.

Capital One has shown that the loss of business is actual and imminent and the ultimate

monetary damages it may suffer are difficult to ascertain, supporting its request for injunctive

relief. First, Capital One faces actual and imminent harm. Uncontroverted evidence presented at

the hearing shows that Defendants diverted deals to ORIX and that ORIX continues to have access to Capital One customer lists and financial information. The harm Capital One suffers "is therefore actual," not "remote or speculative." *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) (lost customers); *accord Fid. Glob. Brokerage Grp., Inc. v. Gray*, No. 1:10cv1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (lost goodwill and customer trust). The threat of future harm is also imminent. Defendants still possess copies of Capital One's loan information and other materials, which Defendants or ORIX may use when competing for Capital One's business.

Second, the actual and imminent harm facing Capital One is irreparable and monetary damages are difficult to ascertain. "Although it may be easy to calculate the amount of harm caused with respect to a single transaction between [Defendants] and a client, the Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill . . . support a finding of irreparable harm.'" *Samilow*, 311 F. Supp. 3d at 796 (quoting *Multi–Channel TV Cable Co.*, 22 F.3d at 552); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985). Additionally, once confidential information is disclosed to a competitor, the information cannot regain its secret status. Given this precedent and the evidence before the Court, Capital One established that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

Because any further disclosure of the confidential information or customer lists at issue would result in irreparable harm to Capital One, the Court finds that this factor weighs in favor of granting injunctive relief.

**C. The Balance of the Equities Favors Preliminary Injunctive Relief Because ORIX Compensated Defendants for Any Interruption in Their Business and Defendants Possess No Legitimate Interest in Capital One's Confidential Information**

The Court next considers the third *Winter* factor: whether the balance of the equities tips in favor of granting preliminary relief. The balance of equities must tip in favor of the movant in order for a preliminary injunction to be granted. *Winter*, 555 U.S. at 20 (stating that a party seeking a preliminary injunction "must establish" all four *Winter* factors before court grants injunctive relief). When weighing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). "[A] balancing of the equities strongly favors granting an injunction to foreclose [a party] from benefitting from [its] misappropriation of [another's] trade secrets." *API Tech. Servs., LLC v. Francis*, No. 4:13cv142, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (quoting *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 709 (E.D. Va. 2012)). It follows that balancing the equities favors granting an injunction where one party may benefit from improperly disclosing the confidential information of the competing party.

Capital One has demonstrated that the balance of the equities tips in its favor. First, Defendants will not be unduly burdened by the injunction sought here. Indeed, Defendants may still work on loans not diverted from Capital One in their pipeline and engage customers beyond the customer lists obtained from Capital One. And in any event, ORIX compensated Defendants with significant one-time signing bonuses to compensate them for any lost business during their employment transition. Second, Defendants have no legitimate interest in possessing quote narratives and specific loan details from Capital One, such as the Loan List or the Maturing Loan

List. Capital One, on the other hand, faces irreparable harm from disclosure of their confidential and proprietary information concerning loans for its customers.

Moreover, any potential hardship Defendants face have been created by their own willful acts in breaching the CWP Agreements. Such "self-inflicted" harm is not enough to tip the equities in their favor. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."). The Sykes Team could have left Capital One on the up-and-up but chose a different path. Thus, the terms of the preliminary injunction are not unduly burdensome to Defendants and reflect Capital One's need to secure a protectible interest pending the resolution of this case. This factor also supports Capital One's request for injunctive relief.

### D. Preliminary Injunctive Relief is in the Public Interest Because Enforcing Valid Contracts Benefits the Public

The public interest, the final *Winter* factor, weighs in favor of granting preliminary relief. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted). Courts within the Fourth Circuit recognize that "[p]ublic interest favors the protection of confidential business information and the enforcement of valid contracts." *Fid. Glob. Brokerage Grp.*, 2010 WL 4646039, at *4 (citing *ABT, Inc. v. Juszczyk*, No. 5:09cv119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010)); *accord Samilow*, 311 F. Supp. 3d at 796. Accordingly, "public interest favors the protection of confidential business information and the enforcement of valid contracts." *Audio-Video Grp., LLC v. Green*, No. 1:14cv169, 2014 WL 793535, at *6 (E.D. Va. Feb. 26, 2014) (citation omitted).

Capital One demonstrates that the public interest weighs in favor of injunctive relief. The public has an interest in allowing companies like Capital One to protect confidential information, to obtain temporary injunctive relief to enjoin any further breach or disclosure, and ultimately to avoid irreparable harm and the destruction of incentives to develop proprietary information. The same would be true for ORIX were the parties flipped.

After due consideration, the Court finds that the four *Winter* factors weigh in favor of granting Capital One's Renewed Motion for Preliminary Injunction.

## IV. Scope of Injunctive Relief

Having found Capital One entitled to a preliminary injunction, the Court must "consider the proper scope of the imposed restraint." *API Tech Servs.*, 2013 WL 1213181, at *4 (citing *Kolon*, 894 F. Supp. 2d at 710). "[I]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992). "Still, a court should mold its decree to meet the exigencies of the particular case." *Id.* (internal quotation marks and citations omitted). "And a court must ensure a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (internal quotation marks and citations omitted).

Here, Capital One has significantly narrowed the scope of its requested injunction from when it first came before this Court seeking a temporary restraining order and injunctive relief. (*Compare* ECF No. 2 *with* ECF No. 52.) The Court finds that the requested preliminary injunction does not overly burden Defendants or provide more relief than necessary to Capital One. For now, the Court has limited the injunction to a nine-month period. This corresponds

with the nine-month period the Court allowed the Parties to engage in discovery, brief their arguments, and present argument before the June 30, 2021 and July 1, 2021 hearing. Because the terms of Capital One's requested preliminary injunction are reasonable, the Court will grant the Motion.

The Court details in its July 1, 2021 Order the precise information and exhibits subject to this preliminary injunction. (ECF No. 74.) Until further Order of the Court, Brian Sykes, Jonathan Wood, and Timothy Smits are enjoined and restrained for nine months from:

> (1) soliciting any business from any client shown on Plaintiff's Exhibit 16 (the client list imported into HubSpot); and,
>
> (2) disclosing to any third-party:
>
>> (a) the quote narratives and customer financial information that Defendants or Michael McNeill emailed from their Capital One email accounts to their personal email accounts; and,
>>
>> (b) information regarding clients and prospective clients contained in the Marketing Plan, the Loan List, and the Maturing Loan List.

### V. Conclusion

For the reasons articulated above, the Court will grant the Renewed Motion for a Preliminary Injunction. (ECF No. 52.) The Court has specified the terms of its injunction in its July 1, 2021 Order. (ECF No. 74.)

/s/<br>
M. Hannah Lauck<br>
United States District Judge

Date: July 9, 2021
Richmond, Virginia